### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | | |
|---|---|---|
| Adam Pajer, | : | |
| | : | |
| Plaintiff, | : | |
| vs. | : | CASE NO.: _____ |
| | : | |
| The Walt Disney Company, | : | |
| Disney Parks, Experiences and | : | |
| Products, Inc., Reedy Creek | : | |
| Improvement District, Walt | : | |
| Disney Parks and Resorts U.S., Inc., | : | |
| | | |
| Defendants. | | |

_____

### COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, by and through the undersigned attorneys, ADAM PAJER, and files this Complaint against Defendants THE WALT DISNEY COMPANY, DISNEY PARKS, EXPERIENCES AND PRODUCTS, INC. (also "DPEP"), REEDY CREEK IMPROVEMENT DISTRICT (also "RCID") and WALT DISNEY PARKS AND RESORTS U.S., INC., (hereinafter referred to corporately as "Disney"), and allege as follows:

### INTRODUCTION

For Mr. Pajer, Disney made his dreams come true. He found his dream job as a part of Disney's cast and excelled in his work for the thousands of Disney guests he

served.  Disney has been for decades a preferred place to work, carefully creating and maintaining an environment of harmony and inclusion.

In 2020, Disney's cast was rocked by the Covid-19 pandemic, but came together as Disney reopened its doors to guests and worked hard to make magic again.  But, in only one year's time, by fall of 2021, Disney targeted cast members who declined Covid-19 vaccinations, including Mr. Pajer, who filed exemptions on grounds of religious faith, stating that taking these injections would violate their deeply held convictions.

Disney could and should have chosen to accommodate these religious beliefs in practice; indeed, to do so would have been to follow state and federal law, Disney's core principles and company policies, including its aspirational Five Keys.  Instead, Disney imposed harsh, unreasonable, and discriminatory "Augmented Health and Safety Protocols" enforced arbitrarily against Plaintiff.  These protocols made clear that Disney irrationally feared Mr. Pajer as perpetually exposed or infectious with disease and a perpetual danger to other cast and guests.

When Mr. Pajer objected respectfully and consistently to Disney's unlawful discrimination against him, Disney failed to remediate its actions contrary to law. Instead, Disney suspended and terminated Mr. Pajer for "Speaking Up" in accordance with law and Disney's own company policy.

## FACTUAL ALLEGATIONS

### Parties, Jurisdiction, and Venue

1. At all times material hereto, Plaintiff Adam Pajer was a resident of Orange County,

Florida and employed by Walt Disney Parks & Resorts, U.S., Inc.

2. **The Walt Disney Company** was organized in Delaware, is headquartered in Burbank, California, and is doing business in Florida, particularly in Orlando and Osceola counties, through its wholly-owned subsidiaries, *inter alia* Defendants: **Disney Parks, Experiences, and Products, Inc.**, a California corporation organized in current form in 2008 and registered in Florida; **Walt Disney Parks and Resorts U.S., Inc.,** a Florida corporation organized in 1997.

3. **Reedy Creek Improvement District** is a local government *special district* established in 1967 by H.B. 486, Chapter 67-764, and carries out local government functions exclusively under Disney authority on Disney's property located within Orange and Osceola counties.

4. This case is severed from *Barbara Andreas, et. al v. The Walt Disney Company, et. al,* State Court Case No. 2022-CA-001697 (Osceola County), removed to MDFL – Orlando Division by Defendants on January 20, 2023, Federal Court Case No. 6:23-cv-00107-ACC-EJK.

5. The Court entered an order severing the case into seven separate lawsuits on January 24, 2023, and instructed that Plaintiff Andreas would retain Federal Case Number 6:23-cv-107 (Order, January 24, 2023, Docket No. 7 ¶ 1).

6. This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343. Mr. Pajer's federal claims arise under 42 U.S.C. § 2000e-5(f), of the Civil Rights Act of 1964, as amended ("Title VII") and 42 U.S.C. § 1981a;

and under 42 U.S.C. §§ 12117 and 12203, of the Americans with Disabilities Act of 1990, as amended ("ADA").

7. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

8. This Court has personal jurisdiction over Defendants in this matter, as all Disney entities herein named Defendants are either Florida corporations or deemed a resident foreign company that conducts its main business in Osceola and Orlando counties; and RCID, as a statutorily created special "district" local government, is subject to the jurisdiction of Florida courts, through which Disney corporately is also a local Florida governmental entity, subject to the jurisdiction of Florida courts.

9. At all relevant times to the allegations in this Complaint, Disney is an employer maintaining a minimum of fifteen employees and is engaged in an industry affecting commerce, pursuant to 42 U.S.C. §2000e(b), (g), (h) and 42 U.S.C. §12111(2), (5).

10. Venue is proper pursuant to 28 U.S.C. §1391, because the wrongful acts and omissions of Disney giving rise to Mr. Pajer's claims occurred in the District where Defendant maintains its central office, and because Defendant is deemed to reside in this District pursuant to § 1391(c)(2).

11. All conditions precedent to this action have occurred, have been performed, or have been waived.

### Disney's Covid-19 Vaccinate-or-Terminate Mandate

12. When the national state of emergency over the Covid-19 pandemic was announced, Disney closed temporarily beginning March 15, 2020, and reopened less than four months later.

13. Upon reopening, Disney's safety protocols for Covid-19 included use of double face masks then acceptable by the CDC (cloth accepted) and social distancing by cast members and guests. For only certain cast, face shields or goggles might be required based on proximity to guests.

14. Cast who were feeling sick or who tested positive for Covid-19 were to isolate at home for five days or until the end of symptoms; wear facial covering at work for an additional five days and socially distance by 6 feet when removing facial covering; and report Covid-19 in the HR cast member portal (as well as to DPEP.Contact.Tracing@disney.com if they reported sick due to positive test). Those who were "unable to wear a face covering while working" were required to stay at home and not report to work for ten days following exposure or until after symptoms ceased. **Exhibit A**[1]

15. On July 30, 2021, Disney announced to its entire U.S. cast a vaccinate or terminate Covid-19 vaccination policy. According to the policy, all subject cast

---

[1] These protocols remained in place, even after Covid-19 vaccination was publicly available in late 2020, and even after Disney's vaccinate or terminate mandate was issued in July 2021, and even simultaneously to Disney's current Augmented Protocols for cast unvaccinated for Covid-19. At no time did Disney require guests to disclose or verify their Covid-19 vaccination status.

members would have to "verify" full vaccination status by a company deadline of September 30, 2021.  **Exhibit B**

16. Upon information and belief, Defendant DPEP is an entity that has significant design and implementation authority as well as enforcement oversight regarding Disney's vaccine mandate in Florida, including but not limited to "restrictions" and "accommodations" requested against the Covid-19 shots, despite the mandate announcement coming from Mr. Paul Richardson, Sr. Executive Vice President and Chief HR Officer at Defendant The Walt Disney Company.

17. The Covid-19 vaccination was "a condition of [] continued employment by The Walt Disney Company" and specified that "fully vaccinated" meant two weeks from the final dose of any two-dose Covid-19 vaccination or the sole dose of the single-dose option.  The Notice also specified that, until impact bargaining completed with union member employees, the mandate only applied as to non-union employees.  Employees subject to collective bargaining agreements would be subject to terms as specified in their respective MOUs reached on the mandate.

18. Apparently, the dire nature of the urgency of obtaining the Covid-19 vaccination was subject to effective negotiation.  Disney informed all cast in September 2021 that various unions involved in representation of cast members had reached agreements regarding extended deadlines, including but not limited to: STCU (Service Trades Council Union) and AEA (Actors Equity Association) extended the deadline from September 30 to October 22; AFM

(American Federation of Musicians) Local 389 to October 31; CMC (Craft Maintenance Council) and BVCC (Buena Vista Construction Company) secured November 1 extended deadline; and SPFPA (Security, Police & Fire Professionals of America) Local 603 secured a November 7 deadline.  Other unions were still in negotiations. Mr. Pajer was a member of United Food and Commercial Workers Local 1625.

19. From the initial announcement until November 18, 2021, cast members were bombarded with many email notices, as well as managerial texts and warnings, to "verify" their Covid-19 vaccination status as fully vaccinated in the online Cast Member Hub.

20. On November 19, Governor DeSantis signed into law Fl. Stat. §381.00317 and §112.0441, rendering unlawful any further "vaccinate or terminate" Covid-19 mandates by Florida employers.

**Disney's Discriminatory Augmented Health & Safety Protocols**

21. That same day, Disney sent an apparently targeted email **Exhibit C,** to cast members who reside or work in Florida and had "not yet verified [] COVID-19 vaccination status with the company" nor "been granted an accommodation." The email stated that Disney would "pause the enforcement" of the mandatory vaccine policy for "Florida-based Cast Members and employees" due both to the new Florida law passed and OSHA's Emergency Temporary Standard (issued November 5, 2021) being stayed by the U.S. Court of Appeals for the Fifth Circuit on November 12, 2021.  The

7

email also pointed out that Disney determined 90% of its Florida staff had complied and were fully vaccinated at that time.

22. Disney still required Covid-19 unvaccinated employees to verify their unvaccinated status through TrustAssure process, and stated plainly that those who did not verify status would be considered unvaccinated. The notice also provided a link to "safety protocols" cast members who were not verified as "fully vaccinated" would be required to follow, "including face coverings and physical distancing," with no additional details thereto.

23. The TrustAssure "verification" program implicates Fl. Stat. § 381.00316's prohibition on business or governmental entities requiring "any documentation certifying COVID-19 vaccination or postinfection recovery to gain access to, entry upon, or service" from the business or governmental entity.

24. Moreover, in the terms of the enforcement of the "Augmented Protocols," the policy is a *de facto* Covid-19 vaccine mandate, in violation of Fl. Stat. § 381.00317 and § 112.0441. From a FAQ for leadership, it is clear the Augmented Protocols are not an exemption under the Florida law, are not voluntarily applied for, and refusal to comply despite other bases for exemption will result in discipline and termination:

> **Why are some Cast required to wear a N95 mask instead of a Disney-supplied face covering?**
> These safety protocols are in place for those who have not verified their vaccination status through TrustAssure. A N95 mask is required for higher contact roles with indoor extended interaction with another individual.
>
> **What happens if I don't follow the Augmented Safety Protocols?**
> Non-compliance with the Augmented Safety Protocols may result in disciplinary action, up to and including termination.
>
> **Do these Augmented Safety Protocols apply to Cast who verified their vaccination status through TrustAssure?**
> No.

25. Over time, and specifically in 2021 through 2022, after vaccination became available to the public, Disney modified its general Covid-19 safety protocols, depending on location and vaccination status – dropping masking outdoors, then dropping social distancing.  On November 8, 2021, vaccinated cast would no longer be required to wear facial covering outside except "on-stage", meaning around guests.

26. By mid-February, 2022, vaccinated cast were no longer required to wear any facial coverings in any location except on Disney transport.  Ultimately by mid-April even the restriction to wear facial coverings on Disney transport lifted for vaccinated cast.

27. On February 24, 2022, the Florida Department of Health issued new guidelines no longer advising businesses to require facial coverings for any employees, on the grounds there is no proven significant clinical benefit against (Covid-19) infection for facial coverings among the general population.

28. Notwithstanding this state-issued health guideline, Disney continued its own policies until May 10, 2022, when it announced that vaccinated cast could follow

local government mask policies.  Unvaccinated employees like Mr. Pajer were still required to abide by the Augmented Protocols, despite state health guidance.

29. Cast members like Mr. Pajer quickly learned that Disney's policy in lieu of a now-unlawful "vaccinate or terminate" scheme was not status quo under general Covid-19 safety protocols, but a new discriminatory scheme that singled out visually and physically cast members like Plaintiff who were unvaccinated for Covid-19.   Disney also declared their new "Augmented Health & Safety Protocols" (hereinafter "Augmented Protocols") as "accommodations" for some approved exemptions as of the fall of 2021.

30. The Augmented Protocols now suddenly enforced on Mr. Pajer consisted of harsh isolation and restrictions, making it nearly impossible to find a compliant manner and location in which to eat or drink while on shift.  The Augmented Protocols effectively added to and made permanent on a daily basis, indefinitely, the Disney Covid policy for Covid-19 positive cast, cast who were symptomatically sick, and cast who were known to have been exposed to Covid-19.  **Exhibit A.**

### COVID-19 Augmented Health & Safety Protocols

Employees and Cast Members who are required to follow the COVID-19 Augmented Health and Safety Protocols must adhere to the following:

- Whether indoors or outdoors, a Disney-supplied face covering must be worn at all times. In addition, when indoors and within three (3) feet of others, a face shield or safety glasses must also be worn.
- You may only remove your face covering if:
  - You are alone in an office with the door shut.
  - You are performing tasks in the approved Green Zone.
  - You are actively performing onstage in a COVID-blocked entertainment offering and maintaining six (6) feet of distance from others.
  - You are six (6) feet of distancing from others and actively eating or drinking.
- If eating or drinking in the workplace, you must remain no less than six (6) feet from others in order to remove your face covering.
- Instead of a Disney-supplied face covering, employees and Cast Members in select high-contact roles may be required to wear a Disney-supplied N-95 mask instead and at all times, both indoors and outdoors. **In addition, when indoors and within three (3) feet of others, a face shield or safety glasses must also be worn.**

*Please note: Your leader and/or Human Resources (HR) will inform you if you are required to follow the Augmented Health & Safety Protocols. This guidance applies only to those employees and Cast Members who have been notified by their leadership and/or who have received an approved accommodations through the Employee Relations process.*

31. None of the written versions of the Augmented Protocols that Mr. Pajer has seen specifies any definition of cast members subject to the Augmented Protocols. None show a date of enforcement nor a date by which these harsh restrictions will be lifted, nor if any conditions precedent may trigger the termination of these Protocols.

32. The Augmented Protocols changed from time to time, and on May 2, 2022, the extreme facial coverings were enforceable indoors as to "select roles" which "may be designated as high contact"; but guests and unvaccinated staff could elect not to use any facial covering. Additionally, all unvaccinated life guards, both indoors and outdoors "must use a ViroMax viral and bacterial filter while

11

actively performing CPR."

33. The federal Occupational Health and Safety Administration ("OHSA") provides guidance and regulation, as well as enforcement of compliance regarding workplace safety. Disney's requirement that certain (Covid-19 unvaccinated) employees wear N-95 PPE, indicates Disney's reliance on particular OSHA standards for handling hazardous substances in the workplace. Disney's accommodations, named "permanent restrictions", for those unvaccinated for religious reasons required cast members to enter the "OSHA respiratory program" at Disney.

34. Whether an (Covid-19) unvaccinated cast member is required to enter the respiratory program or not is ostensibly based on whether the cast member him or herself was in a "high contact role," not whether there were environmental hazards or toxins from which to protect cast members in the workplace. **Exhibit D**

35. However, the OSHA rules regarding hazardous substance precautions are not those applicable to OSHA guidance regarding Covid-19 precautions. For example, workplaces deemed to have possible toxic materials and contaminated air include shipyards, marine terminals, and construction.[2] Disney "restrictions" requiring adherence to a respiratory program were required in public-facing

---

[2] See, eg: https://www.osha.gov/coronavirus/safework#ftn1, last accessed December 21, 2022, *cf* Standard No. 1910.134, *Personal Protective Equipment; Respiratory protection,* at https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.134, last accessed December 21, 2022.

hospitality and service roles in theme parks, resorts and other non-industrial, non-medical services workplaces.

36. Indeed, Disney's requirement that Covid-19 unvaccinated, "unverified" cast with religious exemption requests like Mr. Pajer wear respirators under the Augmented Protocols contravenes OSHA standards for workplace safety in the presence of hazardous substances. Proper training must be given when wearing respirators like N95 masks, and OSHA, as well as respirator manufacturers recognize the likelihood of "hazards associated with the use of the respirator," such that extended use of the facial covering without respite is against proper guidance.[3]

37. Manufacturer guidance regarding respirators like N95 masks also clearly warn that the respirators may be used in the event of "exposures to certain airborne biological particles (e.g. viruses, mold, *Bacillus anthracis, Mycobacterium tuberculosis,* etc) but cannot eliminate the risk of contracting infection, illness, or disease." The instructions further specify "limitations" of use of PPE, including that the "respirator is designed for occupational/professional use by adults who are properly trained in their use and limitations. Individuals with a compromised respiratory system…should consult a physician and complete a medical evaluation prior to use." Respirators also have a "shelf life" or expiration date in their packaging and must be stored in proper temperature and humidity

---

[3] *Id.* and see **Exhibit E,** 3M Manufacturer specifications, user instructions, and warning regarding Aura™ Particulate Respirator N95.

conditions.  **Exhibit E.**

38. By early August, the Centers for Disease Control ("CDC") issued its advisory that there was no health or safety basis upon which to engage in different policies or treatment toward the Covid-19 vaccinated and unvaccinated.

39. On August 16, 2022, Disney finally dropped enforcement of its harsh and discriminatory Augmented Protocols.  **Exhibit F.** This announcement came within days of OSHA's Guidance Update reflecting CDC changed guidance against disparate treatment of Covid-19 vaccinated and unvaccinated.  However, the announcement made no admission of the unlawful nature of the humiliating and discriminatory Augmented Protocols.  Rather, the notice indicated Disney was free to engage in open discrimination in the future in the same fashion: "These protocols are subject to change at any time.  Employees represented by a union/Return-to-Work Agreement, please consult your leader to understand what protocols apply to you."

## Reedy Creek Improvement District

40. Defendant The Walt Disney Company acquired the land that became Reedy Creek Improvement District in the 1960s.  By 1966, the landowners – all Disney subsidiary business entities – petitioned the Circuit Court of the Ninth Judicial Circuit  for creation of the "Reedy Creek Drainage District under Fl. Stat. § 298, *et seq.*, which was then incorporated as a public corporation on May 13, 1966.

41. In accordance with Mr. Walt Disney's vision for the property, Disney then petitioned the Florida State Legislature for the creation of the "Reedy Creek

Improvement District," which was a virtually autonomous local Florida government as a *special district*, created by the Reedy Creek Improvement Act, signed into law on May 12, 1967.[4]

42. RCID is an entire district, or local government, that carries out all the basic functions of a local government with many of the powers thereof. Prior to the creation of RCID, these services for this region were originally and solely performed by the governments of Orange and Osceola Counties. These services include:

- Law enforcement - Disney contracts with Orange and Osceola County local law enforcement agencies
- Fire Department
- Environmental Protection - through the donation of land to the state for conservation easements
- Creation and Enforcement of its own building codes
- Utilities - wastewater treatment and collection, water reclamation, electric generation and distribution, solid waste disposal, potable water, natural gas distribution, and hot and chilled water distribution are managed through Reedy Creek Energy Services, which has been merged with the Walt Disney World Company
- Roads - Many of the main roads in the District are public roads maintained by the District, while minor roads and roads dead-ending at attractions are private roads maintained by Disney; in addition, state-maintained Interstate 4 and U.S. Highway 192 pass through the District, as does part of the right-of-way of County Road 535 (formerly State Road 535).
- Transportation - Disney provides transportation for guests and employees in the form of buses, ferries, and monorails, under the

---

[4] Chapter 67-764 created the Reedy Creek Improvement District, see https://www.rcid.org/wp-content/uploads/2015/10/RCID-Charter.pdf last accessed on December 21, 2022; Chapter 67-1104 established the City of Bay Lake; and Chapter 67-1965 established the City of Reedy Creek (later renamed as the City of Lake Buena Vista around 1970.)

name Disney Transport. In addition, several Lynx public bus routes enter the District, with half-hour service between the Transportation and Ticket Center (and backstage areas at the Magic Kingdom) and Downtown Orlando and Kissimmee, and once-a-day service to more points, intended mainly for cleaning staff. Half-hourly service is provided, via Lynx, to Orlando International Airport

43. Disney exercises complete control of RCID and enjoys a self-beneficial arrangement whereby it pays local taxes to the RCID, which in turn, reinvests that tax revenue into Disney enterprises and businesses. The United States Court for Middle the District of Florida has found that "[t]he evidence does not support the contention that Disney and Reedy Creek are completely separate entities that do not exert control over each other, rather than "common employers," "joint employers," or parts of an agent/principal relationship." *See Lang et. al v. Reedy Creek Improvement District*, 888 F. Supp. 1143 (M.D. Fla. 1995). Thus, under Florida Law, Defendant The Walt Disney Company, and collectively, Disney subsidiaries operating within Florida, constitute a local government entity, subject to Florida constitutional and statutory requirements of public employers.

44. The municipalities Bay Lake and Lake Buena Vista which are located within RCID function as company towns within the Disney company *district* under Florida law. RCID property is open for use by the general public, serving an average of 250,000 people in the Walt Disney World parks and resorts on a daily basis with over 75,000 employees in Florida alone.

45. Indeed, the state of Florida has now passed legislation stripping The Walt Disney

Company of certain of its governmental power and autonomy through RCID. At the time of this filing, the bill as passed is pending action by Governor Ron DeSantis. See CS-HB9B.

### Mr. Pajer's Employment with Disney

46. Mr. Pajer has been a cast member at Disney for seven years since May 2015, most recently as a Banquet Server or as-needed Banquet Captain with the Orlando Disney resorts and theme parks. In his position, Mr. Pajer served and cleared tables for guests, set tables with linens, polished glass and silverware, set buffets, bars, and bartended, as needed. He had leadership obligations in preparing for events, including helping to set up supplies according to a Banquet Event Order, if he was first to the property to begin set up.

47. When Disney returned cast members to work, Mr. Pajer returned to his shifts, but then Disney began its vaccinate or terminate mandate a year later. On October 15, 2021, Mr. Pajer filed his religious exemption request with Disney. This exemption has never been processed to conclusion.

48. He declared his Christian beliefs that dictated his refusal of the Covid-19 vaccine, despite Disney's mandate, and provided supporting Bible references: John 8:32, John 14:6, John 11:25, 1 Corinthians 3:16-17, and Ecclesiastes 7:17. He stated that he must care for his body as "God's temple" and that the "truth is through God the Father and his Son Jesus", such that he is obligated to pursue the truth about what he puts into his body and avoid self-harm or the risk of self-harm. "Our bodies were not made by God to put a known poison into it," he concluded.

**Exhibit G.**

49. Since Fall 2021, after prior threats of termination under the vaccination mandate, Mr. Pajer's managers have treated him as if he were leprous. Mr. Pajer was never given an option by Disney to receive any alternative or accommodation in lieu of the Augmented Protocol requirements, more restrictive than facial covering and Covid-19 safety protocol during the height of the Covid-19 pandemic in 2020.

50. On February 5, 2022, Mr. Pajer sent around a notice in a group chat to other part time cast members pertaining to the discriminatory Augmented Protocols. He asserted:

> Managers are starting to discriminate against people who didn't take the experimental propaganda procedures. They tried on me but could not even show where it says that I had to wear a mask backstage when others do not. I told them it was discriminatory and I will at this time not be complying and asked for them to call HR….Also many managers seem to be doing this unaware [sic]. Please remind them that we have equal protection under the law and we must all be protected equally.

51. In the end of February when all restrictions for all guests and "verified" vaccinated cast members were lifted, one of Mr. Pajer's managers, Lauren M. Lahr, confronted him and demanded he wear a mask at all times inside and outside on Company property. From then on, Mr. Pajer received mixed information regarding masking from his supervisors. During one shift, three catering managers did not enforce any Augmented Protocols against Mr. Pajer while he was on shift.

52. However, on Mr. Pajer's last shift in February 2022, Shelly Dunkley required

Mr. Pajer to wear facial covering. He refused and informed her he had submitted his religious exemption to the Company, and he had yet to hear back from them. Mr. Pajer informed Ms. Dunkley she was discriminating against him. Ms. Dunkley had another manager get involved, Russell P. Bennage, who told Mr. Pajer he must wear a mask at all times, only to take it off when actively eating or drinking. These two managers made clear to Mr. Pajer it did not matter that he submitted a religious exemption request.

53. Mr. Pajer continued to provide written and verbal notice to Disney regarding its ongoing, habitual, and blatant violation of his civil rights. On May 5, 2022, Mr. Pajer reached out to Peyton Keaton by email, detailing the ongoing discrimination against him. He also reiterated Disney HR's failure to respond to him or indicate anything regarding his prior exemption applications. Mr. Pajer clearly indicated to Mr. Keaton that the unequal treatment of cast members, with some being subject to harsh, unreasonable, and punitive Augmented Protocols, while others were able to work mask-free and not visibly singled out for any reason, was a violation of law. Mr. Pajer also informed Disney he had filed a report with the Private Employer Vaccine Mandate Program.

54. On May 12, 2022, Mr. Pajer was working a regular shift at the Disney Yacht and Beach Resort. He printed written statements to hand out to managers who had been enforcing the unlawful Augmented Protocols. While he was walking toward his work location and attempting to hand this document to his manager

Sharon Edwards-David, she raised her voice and yelled at him to not talk to her. He offered his written statement to her and verbally told her she was violating law with her conduct, then continued working.



55. Ms. Edwards-David then gathered two other managers, Quentin Schofield, and Wes Mohler and called Mr. Pajer into an office where they repeatedly belittled, harassed, and verbally attacked him while he attempted to explain how their conduct discriminated against him and violated law.

56. Mr. Pajer attempted to give one of his papers to them. Instead of accepting it and then disposing of it, Mr. Schofield grabbed a lighter and attempted to burn it while Mr. Pajer still held the paper in his hand.

57. In retaliation for Mr. Pajer's efforts to assert his rights and inform Disney management of its unlawful conduct against him, the managers demanded he leave the premises, cut his shift, and lose the rest of his shift pay. Mr. Schofield yelled at Mr. Pajer and claimed Mr. Pajer was bringing Disney's discriminatory actions on himself. He laughed at Mr. Pajer and all three ridiculed him. Mr.

Mohler walked Mr. Pajer to the timeclock and required him to punch out and leave.

58. On May 14, 2022, Disney suspended Mr. Pajer. This suspension was implemented directly after and as a result of Mr. Pajer's complaints regarding the illegal discrimination against him by Disney - and after he filed a complaint with the PEVMP regarding Disney's conduct. **Exhibit G**

59. Additionally, Mr. Pajer requested that Disney speak only to his attorney after the May 12 incident with the three managers. Disney flatly denied this reasonable request according to Mr. Pajer's union representative. In fact, Disney pressed Mr. Pajer, without the assistance of his counsel, to submit his written statement regarding the event and to speak to Disney representatives without the presence of counsel. Mr. Pajer's counsel also reached out to Disney directly on June 4, 2022, to which Mr. Peyton replied only to Mr. Pajer:

I am writing to acknowledge receipt of Rachel's email. The Company does not include non-employees in our workplace investigations. Employee Relations would still like the opportunity to hear from you about your allegations of discrimination. Additionally, Leadership has follow up questions about your workplace conduct on May 12, 2022. Leadership will be calling you to schedule this meeting.

60. Additionally, from May 14 to June 28, 2022, Disney continued to schedule Mr. Pajer for shifts, despite having taken from him his company ID card to enter Disney property to report for work. Counsel inquired on June 3 of Mr. Campbell at Disney as to Mr. Pajer's status and requirement to report for his next shift scheduled on June 5. Disney never responded to counsel, and only

manager Richie Acosta provided acknowledgement to Mr. Pajer he was under suspension would not need to report.

61. Mr. Pajer's counsel sent a letter on June 15, 2022 to Disney via Defendant DPEP, detailing Disney's violations of law and demanding reinstatement of Mr. Pajer.

62. On June 21, 2022, Mr. Pajer met with two of his banquet managers, Jim Campbell, and Donnie Gill and shop steward Glenn Guider. Mr. Campbell provided a blank piece of paper to Plaintiff Pajer and advised that Plaintiff Pajer could write down new accusations Disney had made against him. These included:

- The manager said I was in her personal space.
- That I robotically ranted about Disney taking away my rights.
- That the leader was fearful of me.
- That I was overly aggressive [in] trying to give her a piece of paper.
- That I refused to go back to work.
- That somehow, I mentioned about 'calling my people.'

63. Mr. Pajer was shocked by these statements. Mr. Campbell advised Mr. Pajer to write down his side of the story for the company to investigate. He rejected all the absurd and incoherent charges and requested that Disney contact counsel.

64. On June 28, Disney terminated Mr. Pajer's employment without further investigation. Mr. Pajer has filed claims of discrimination and retaliation with the Florida Commission on Human Relations and concurrently with the EEOC. He also filed a complaint against Disney to the PEVMP. Mr. Pajer received his Right to Sue Notice December 23, 2022.

22

## COUNT I
## FLORIDA PRIVATE WHISTLEBLOWER STATUTE
## FL. STAT. §448.101, et seq.
### *Against Defendants The Walt Disney Company; Disney Parks, Experiences, and Products, Inc.; and Walt Disney Parks and Resorts U.S., Inc.*

65. Paragraphs 1-64 are hereby incorporated by reference as if fully restated.

66. Florida Statute §448.102 prohibits an employer taking "any retaliatory personnel action against an employee because the employee has: (1)   Disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation. However, this subsection does not apply unless the employee has, in writing, brought the activity, policy, or practice to the attention of a supervisor or the employer and has afforded the employer a reasonable opportunity to correct the activity, policy, or practice. (2)   Provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer. (3)   Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."

67. The statute defines "retaliatory personnel action" as "discharge, suspension, or demotion by an employer of an employee or any other adverse employment action taken by an employer against an employee in the terms and conditions of employment." Fl. Stat. §448.101(5).

68. Mr. Pajer has provided on multiple occasions his written notice to Disney of

Disney's unlawful acts, including his emails to supervisors regarding objection to Disney's discriminatory practices and his counsel's letter to Disney outlining Disney's legal violations and demanding reinstatement, and his intention to and actual filing of claims to appropriate governmental authorities against Disney for those unlawful acts.

69. Mr. Pajer has filed claims under certification of Disney's de facto violation of Covid-19 vaccination prohibition with the Private Employer Vaccine Mandate Program, and informed Disney of the same.

70. Mr. Pajer has filed his claims under oath of religious discrimination and retaliation before the Florida Commission on Human Relations and/or EEOC, or both concurrently.

71. Disney was provided ample time to remediate its unlawful conduct, and refused to do so, instead doubling-down on unlawful conduct and retaliation against Mr. Pajer.

72. Mr. Pajer's repeated requests for Disney to address his concerns and cease its discriminatory policies went unanswered. Subsequent to Plaintiff's repeated requests, Disney instead fabricated charges against Mr. Pajer and suspended him.

73. Mr. Pajer never had a proper investigation of his claims and was suspended and subsequently terminated on pretextual grounds. Disney's suspension and termination of Plaintiff is retaliatory for his vocal and persistent, lawful challenges to Disney's unlawful conduct.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor

and against Defendants, order Disney to reinstate his employment, order Disney to remove disciplinary documentation in Plaintiff's file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

## COUNT II
## FLORIDA WHISTLE-BLOWER'S ACT
## FL. STAT. § 112.3187, et seq.
### *Against All Defendants*

74. Paragraphs 1-64 are hereby incorporated by reference as if fully restated.

75. In the alternative to Disney as a private business, as pled in this Complaint, Defendant The Walt Disney Company, by virtue of its total control and ownership over local Florida public entity and governmental agency RCID, is a state agency and subject to Fl. Stat. § 112.3187.

76. All other Defendants, as subsidiaries of The Walt Disney Company and as the entities through which The Walt Disney Company engages in its business in Florida, including within the jurisdiction of the RCID, are collectively, together with The Walt Disney Company, a local Florida public entity and governmental agency, subject to Fl. Stat. § 112.3187.

77. The Florida Whistle-blower's Act prohibits a public entity "from taking retaliatory action against an employee who reports to an appropriate agency violations of law." Fl. Stat. § 112.3187(2). An agency "shall not dismiss,

25

discipline, or take any other adverse personnel action…[nor] take any adverse action that affects the rights or interest of a person in retaliation for the person's disclosure of information" identified in the Act. *Id.* at (4)(a)-(b).

78. The Act covers disclosure of information that includes:

   a. Any violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee of an agency which creates and presents a substantial and specific danger to the public's health, safety, or welfare.

   b. Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds…or gross neglect of duty committed by an employee or agent of an agency.

   Fl. Stat. § 112.3187(5).

79. The employee's disclosure of protected information concerning a local governmental entity, including a public entity such as Disney, must be to the chief executive officer (Fl. Stat. § 447.203(9)) or other appropriate local officials. Fl. Stat. § 112.3187(6). The "other appropriate local officials," include supervisors and upper management for Mr. Pajer.

80. The Act protects employees "who refuse to participate in any adverse action prohibited by this section" and "file any written complaint to their supervisory officials." Fl. Stat. § 112.3187(7). "Adverse personnel action" means the discharge, suspension, transfer, or demotion of any employee or the withholding of bonuses, the reduction in salary or benefits, or any other adverse

action taken against an employee within the terms and conditions of employment by an agency or independent contractor. §112.3187(3)(c).

81. Mr. Pajer has provided on multiple occasions his written notice to Disney of Disney's unlawful acts, including his emails to supervisors regarding objection to Disney's discriminatory practices and his counsel's letter to Disney outlining Disney's legal violations and demanding reinstatement, and his intention to and actual filing of claims to governmental authorities against Disney for those unlawful acts.

82. Mr. Pajer has filed claims under certification of Disney's de facto violation of Covid-19 vaccination prohibition with the Private Employer Vaccine Mandate Program, and informed Disney of the same.

83. Mr. Pajer has filed his claims under oath of religious discrimination and retaliation before the Florida Commission on Human Relations and/or EEOC, or both concurrently.

84. Disney was provided ample time to remediate its unlawful conduct, and refused to do so, instead doubling-down on unlawful conduct and retaliation against Mr. Pajer.

85. Plaintiff's repeated requests for Disney to address his concerns and cease its discriminatory policies went unanswered. Subsequent to Plaintiff's repeated requests, Disney instead fabricated charges against Mr. Pajer and suspended him.

86. Mr. Pajer has never had a proper investigation of his claims and was subsequently terminated on pretextual grounds.  Disney's suspension and termination of

Plaintiff is retaliatory for his vocal and persistent, lawful challenges to Disney's unlawful conduct.

87. Mr. Pajer has exhausted his administrative remedies prior to bringing this claim before this Court.  Fl. Stat. § 112.3187(8).

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, order Disney to reinstate his employment, order Disney to remove disciplinary documentation in Plaintiff's file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

## COUNT III
## DISCRIMINATION CONTRARY TO FLORIDA CIVIL RIGHTS ACT
## FL STAT § 760.07, § 760.10
### *Against All Defendants*

88. Paragraphs 1-64 are hereby incorporated by reference as if fully restated.

89. The Florida Civil Rights Act ("FL CRA") prohibits an employer from discriminating against an employee "because of race, color, religion, gender, pregnancy, national origin, age, handicap, or marital status in the areas of education, employment, or public accommodations." Fl. Stat. § 760.07.

90. Prohibited employment practices include:

   a.    "(1)(a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to

28

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

b.  "(1)(b) To limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

c.  "(2) to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status or to classify or refer for employment any individual on the basis of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status."

d.  "(6) to print, or cause to be printed or published, any notice or advertisement relating to employment, membership, classification, referral for employment, or apprenticeship or other training, indicating any preference, limitation, specification, or discrimination, based on race, color, religion, sex, pregnancy, national origin, age, absence of handicap, or marital status."

Fl. Stat. § 760.10.

91. Disney is subject to FL CRA, as an employer "employing 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year…." Fl. Stat. § 760.02(7).

92. Disney engaged in prohibited employment practices under FL CRA by imposing a covid-19 vaccine mandate which threatened to fire and refused to hire individuals because of their religious belief against covid-19 vaccination and Disney's perception of their disability relating to or arising from their medical status.

93. Disney engaged in prohibited employment practices under FL CRA when, upon refusing to process or respond to Mr. Pajer's religious exemption request, Disney unlawful terminated his employment.

94. Disney engaged in prohibited employment practices under FL CRA when, upon Florida law prohibiting Covid-19 vaccinate-or-terminate mandates went into effect, Disney began a program under "Augmented Health & Safety Protocols" by which Mr. Pajer, whose religious beliefs prohibited taking the Covid-19 vaccine,  would be segregated and classified apart from other Disney cast and forced to wear specific facial coverings, including respirators and other PPE, or face discipline and termination.

95. Disney engaged in prohibited employment practices under FL CRA when it perceived Mr. Pajer as disabled and unable to complete the functions of his job in his medical status and unlawfully terminated his employment on the basis of this perception.

96. Disney engaged in prohibited employment practices under FL CRA by applying the discriminatory and humiliating Augmented Protocols against Mr. Pajer, because it perceived Plaintiff as disabled and unable to complete the functions of his job in his medical status and therefore unlawfully segregated and classified him apart from other Disney cast and forced him to wear specific facial coverings, including respirators and other PPE, or face discipline and termination.

97. Even though Mr. Pajer clearly posed no health threat to Florida Disney employees, Disney treated Mr. Pajer as though he were a continually contagious vector of disease and dangerous.

98. Indeed, Disney's improper "cherry-picking" of OSHA Rules and guidelines regarding industrial environment hazards and toxic materials to force only those cast like Mr. Pajer whom Disney perceived as disabled and dangerous to wear PPE for extended periods without respite illustrates Disney's true sentiment and message that Plaintiff *is* the toxic substance or environmental hazard in the Disney workplace.

99. Disney's unlawful discrimination is the direct and proximate cause of deprivation of Mr. Pajer's equal employment opportunities and his economic and non-economic damages.  Disney's unlawful conduct has caused Plaintiff damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of his civil rights, from

humiliating mistreatment and discrimination, and from being singled out among other cast members for his religious beliefs and perceived disability.

100. Disney's misconduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiff so as to entitle him to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

101. Plaintiff has exhausted his administrative remedies prior to bringing this claim before this Court.  Fl. Stat. § 760.11.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, order Disney to reinstate his employment, order Disney to remove disciplinary documentation in Plaintiff's file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

## COUNT IV
## RETALIATION CONTRARY TO FLORIDA CIVIL RIGHTS ACT
## FL STAT § 760.10(7), § 760.10
### *Against All Defendants*

102. Paragraphs 1-64 are hereby incorporated by reference as if fully restated.

103. The Florida Civil Rights Act ("FL CRA") prohibits an employer's "discriminat[ing] against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in

any manner in an investigation, proceeding, or hearing under this section.."
Fl. Stat. § 760.10(7).

104. Disney is subject to FL CRA, as an employer "employing 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year…."  Fl. Stat. § 760.02(7).

105. Mr. Pajer has provided on multiple occasions his written notice to Disney of Disney's unlawful acts, including his emails to supervisors regarding objection to Disney's discriminatory practices and his counsel's letter to Disney outlining Disney's legal violations and demanding reinstatement, and his intention to or actual filing of claims to governmental authorities against Disney for those unlawful acts.  Disney subsequently disciplined, suspended, and/or terminated Plaintiff's employment in violation of FL CRA.

106. Mr. Pajer has filed claims under certification of Disney's de facto violation of Covid-19 vaccination prohibition with the Private Employer Vaccine Mandate Program, and informed Disney of the same.

107. Plaintiff has filed his claims under oath of religious discrimination and retaliation before the Florida Commission on Human Relations and/or EEOC, or both concurrently.

108. Disney was provided ample time to remediate its unlawful conduct, and refused to do so, instead doubling-down on unlawful conduct and retaliation against Mr. Pajer.

109. Subsequent to Mr. Pajer's repeated requests for Disney to address his concerns

and cease its discriminatory policies, Disney instead fabricated charges against him and suspended him.

110. Mr. Pajer has never had a proper investigation of his claims and was suspended ans subsequently terminated on pretextual grounds. Disney's suspension and termination of Plaintiff is retaliatory for his vocal and persistent, lawful challenges to Disney's unlawful conduct.

111. Disney's unlawful retaliation is the direct and proximate cause of deprivation of Plaintiff's equal employment opportunities and his economic and non-economic damages. Disney's unlawful conduct has caused Plaintiff damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of his civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for his religious beliefs and perceived disability.

112. Disney's misconduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiff so as to entitle him to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

113. Plaintiff has exhausted his administrative remedies prior to bringing this claim before this Court. Fl. Stat. § 760.11.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, order Disney to reinstate his employment, order Disney to remove disciplinary documentation in Plaintiff's file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement

of the unlawful Augmented Protocols against all cast members, and order Disney to pay Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

### COUNT V
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED ("TITLE VII") 42 U.S.C. §§ 2000e, *et seq*; DISCRIMINATION ON THE BASIS OF RELIGIOUS BELIEF AND PRACTICE
### *Against All Defendants*

114. Paragraphs 1-64 are hereby incorporated by reference as if fully restated.

115. Title VII (42 U.S.C. § 2000e-2(a)) provides that:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

116. Religion under the statute "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). It is well established in the law that part of

religious observance and practice may involve refusal of medical treatment and vaccination.

117. At all relevant times to the allegations in this Complaint, Disney is an employer maintaining a minimum of fifteen employees and is engaged in an industry affecting commerce, pursuant to 42 U.S.C. §2000e(b), (g), (h) and 42 U.S.C. §12111(2), (5).

118. Disney engaged in prohibited employment practices under Title VII by imposing a covid-19 vaccine mandate which threatened to fire and refused to hire individuals because of their religious belief against covid-19 vaccination.

119. Disney engaged in prohibited employment practices under Title VII when, upon refusing to process or respond to Mr. Pajer's religious exemption request, Disney unlawfully terminated his employment.

120. Disney engaged in prohibited employment practices under Title VII when, upon Florida law prohibiting Covid-19 vaccinate-or-terminate mandates went into effect, Disney began a program under "Augmented Health & Safety Protocols" by which Plaintiff Pajer, with religious beliefs prohibiting taking the Covid-19 vaccine, would be segregated and classified apart from other Disney cast and forced to wear specific facial coverings, including respirators and other PPE, or face discipline and termination.

121. Disney's unlawful discrimination is the direct and proximate cause of deprivation of Mr. Pajer's equal employment opportunities and his economic and non-economic damages. Disney's unlawful conduct has caused Plaintiff

damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of his civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for his religious beliefs.

122. Disney's misconduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiff so as to entitle him to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

123. Plaintiff has exhausted his administrative remedies prior to bringing this claim before this Court. 42 U.S.C. § 2000e-5.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, order Disney to reinstate his employment, order Disney to remove disciplinary documentation in Plaintiff's file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

### COUNT VI
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED ("TITLE VII") 42 U.S.C. §§ 2000e, *et seq*; RETALIATION
#### *Against All Defendants*

124. Paragraphs 1-64 are hereby incorporated by reference as if fully restated.

125. Title VII (42 U.S.C. § 2000e-3(a)) prohibits retaliation against an employee for

opposing an employer's unlawful action prohibited by Title VII: "It shall be an unlawful employment practice for an employer… to discriminate against any individual… because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

126. At all relevant times to the allegations in this Complaint, Disney is an employer maintaining a minimum of fifteen employees and is engaged in an industry affecting commerce, pursuant to 42 U.S.C. §2000e(b), (g), (h) and 42 U.S.C. §12111(2), (5).

127. Mr. Pajer has provided on multiple occasions his written notice to Disney of Disney's unlawful acts, including his emails to supervisors regarding objection to Disney's discriminatory practices and his counsel's letter to Disney outlining Disney's legal violations and demanding reinstatement, and his intention to or actual filing of claims to governmental authorities against Disney for those unlawful acts.  Disney subsequently disciplined, suspended, and/or terminated Plaintiff's employment in violation of Title VII.

128. Mr. Pajer has filed claims under certification of Disney's de facto violation of Covid-19 vaccination prohibition with the Private Employer Vaccine Mandate Program, and informed Disney of the same.

129. Mr. Pajer has filed his claims under oath of religious discrimination and retaliation before the Florida Commission on Human Relations and/or EEOC,

or both concurrently.

130. Disney was provided ample time to remediate its unlawful conduct, and refused to do so, instead doubling-down on unlawful conduct and retaliation against Plaintiff.

131. Subsequent to Plaintiff's repeated requests for Disney to address his concerns and cease its discriminatory policies, Disney instead fabricated charges against Mr. Pajer and suspended him.

132. Mr. Pajer has never had a proper investigation of his claims and was subsequently terminated on pretextual grounds. Disney's suspension and termination of Plaintiff is retaliatory for his vocal and persistent, lawful challenges to Disney's unlawful conduct.

133. Disney's unlawful retaliation is the direct and proximate cause of deprivation of Plaintiff's equal employment opportunities and his economic and non-economic damages. Disney's unlawful conduct has caused Plaintiff damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of his civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for his religious beliefs.

134. Disney's misconduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiff so as to entitle him to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

135. Plaintiff has exhausted his administrative remedies prior to bringing this claim

before this Court.  42 U.S.C. § 2000e-5.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, order Disney to reinstate his employment, order Disney to remove disciplinary documentation in Plaintiff's file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay each Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

## COUNT VII
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990, AS AMENDED ("ADA") 42 U.S.C. §§ 12111, *et seq*; DISCRIMINATION ON THE BASIS OF PERCEIVED DISABILITY
### *Against All Defendants*

136. Paragraphs 1-64 are hereby incorporated by reference as if fully restated.

137. Mr. Pajer is a "qualified individual" who was an employee of Disney, as defined under the ADA. 42 U.S.C. § 12111(4), (8).  Plaintiff performed the essential functions of his position admirably for the span of his seven year career, and prior to its Covid-19 vaccine mandate imposed in July 2021, performed the essential functions of his position using Disney's universally applied Covid-19 safety policies for protection.

138. At all relevant times to the allegations in this Complaint, Disney is an employer maintaining a minimum of fifteen employees and is engaged in an industry affecting commerce, pursuant to 42 U.S.C. §2000e(b), (g), (h) and 42 U.S.C.

40

§12111(2), (5).

139. The ADA prohibits discrimination against disabled persons in the employment context. An employee is considered to have a disability if he or she: has "(A) a physical or mental impairment that substantially limits one or more of that person's major life activities; (B) has a record of such impairment; or (C) is regarded as having such an impairment…." 42 U.S.C § 12102(1).

140. To establish a disability under the third definition, being regarded as having an impairment, the ADA provides:

> (A)    An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
>
> (B)    Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

42 U.S.C. § 12102(3).

141. At all relevant times material to this action, Covid-19 was a well-known, highly contagious, and sometimes deadly virus that has resulted in a global pandemic. Furthermore, Disney's strictly enforced vaccinate-or-terminate policy for Covid-19 injections confirms its position that Covid-19 infection and transmission is a serious, ongoing concern.

142. Mr. Pajer objected to Disney's mandatory covid-19 vaccination, submitting his request for religious exemption, and being willing to discuss reasonable

accommodation with Disney, if Disney had been willing to do so.

143. Disney engaged in prohibited employment practices under ADA by imposing a covid-19 vaccine mandate which threatened to fire and refused to hire individuals because of Disney's perception of their "handicap" relating to or arising from their lack of Covid-19 vaccination.

144. Disney engaged in prohibited employment practices under the ADA when it perceived Mr. Pajer as disabled and unable to complete the functions of his job in his medical status and unlawfully terminated him on the basis of this perception.

145. Disney engaged in prohibited employment practices under ADA by applying the discriminatory and humiliating Augmented Protocols against Mr. Pajer because it perceived Plaintiff as disabled and unable to complete the functions of his job in his medical status and therefore unlawfully segregated and classified his apart from other Disney cast and forced him to wear specific facial coverings, including respirators and other PPE, or face discipline and termination.

146. Even though Mr. Pajer clearly posed no health threat to Florida Disney employees, Disney treated Plaintiff as though he was a continually contagious vector of disease and dangerous.

147. Indeed, Disney's improper "cherry-picking" of OSHA Rules and guidelines regarding industrial environment hazards and toxic materials to force only those cast like Mr. Pajer whom Disney perceived as disabled and dangerous to

wear PPE for extended periods without respite illustrates Disney's true sentiment and message that Mr. Pajer *is* the toxic substance or environmental hazard in the Disney workplace.

148. Disney's assumption of Mr. Pajer's risk in the workplace is not based on any reasonable understanding of the facts regarding his ability to perform his essential job duties with or without accommodation. Defendant failed to make any individualized risk assessment regarding Mr. Pajer's perceived disability. There was no factual support for the idea that Mr. Pajer could not perform his essential job duties as he had for seven years, and in fact during the Covid-19 pandemic.

149. Disney's unlawful discrimination is the direct and proximate cause of deprivation of Mr. Pajer's equal employment opportunities and his economic and non-economic damages. Disney's unlawful conduct has caused Plaintiff damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of his civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for a perceived disability.

150. Disney's conduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiff so as to entitle him to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

151. Plaintiff has exhausted his administrative remedies prior to bringing this claim before this Court. 42 U.S.C. § 2000e-5.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, order Disney to reinstate his employment, order Disney to remove disciplinary documentation in Plaintiff's file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement of the unlawful Augmented Protocols against all cast members, and order Disney to pay Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

## COUNT VIII
## VIOLATION OF THE ADA, 42 U.S.C. §§ 12203;
## PROHIBITED RETALIATION AND COERCION
### *Against All Defendants*

152. Paragraphs 1-64 are hereby incorporated by reference as if fully restated.

153. Plaintiff Pajer is a "qualified individual" who was an employee of Disney, as defined under the ADA. 42 U.S.C. § 12111(4), (8).

154. At all relevant times to the allegations in this Complaint, Disney is an employer maintaining a minimum of fifteen employees and is engaged in an industry affecting commerce, pursuant to 42 U.S.C. §2000e(b), (g), (h) and 42 U.S.C. §12111(2), (5).

155. The ADA prohibits retaliation and coercion for protected activities:

(a) Retaliation
No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) Interference, coercion, or intimidation
It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203.

156. Mr. Pajer has provided on multiple occasions his written notice to Disney of Disney's unlawful acts, including his emails to supervisors regarding objection to Disney's discriminatory practices and his counsel's letter to Disney outlining Disney's legal violations and demanding reinstatement, and his intention to or actual filing of claims to governmental authorities against Disney for those unlawful acts. Disney subsequently disciplined, suspended, and/or terminated Plaintiff's employment in violation of the ADA.

157. Mr. Pajer has filed claims under certification of Disney's de facto violation of Covid-19 vaccination prohibition with the Private Employer Vaccine Mandate Program, and informed Disney of the same.

158. Mr. Pajer has filed his claims under oath of religious discrimination and retaliation before the Florida Commission on Human Relations and/or EEOC, or both concurrently.

159. Disney was provided ample time to remediate its unlawful conduct, and refused to do so, instead doubling-down on unlawful conduct and retaliation against Mr. Pajer.

160. Subsequent to Plaintiff's repeated requests for Disney to address his concerns

and cease its discriminatory policies, Disney instead fabricated charges against Mr. Pajer and suspended him.

161. Mr. Pajer has never had a proper investigation of his claims and was subsequently terminated on pretextual grounds.  Disney's suspension and termination of Plaintiff is retaliatory for his vocal and persistent, lawful challenges to Disney's unlawful conduct.

162. Disney's unlawful retaliation is the direct and proximate cause of deprivation of Plaintiff's equal employment opportunities and hid economic and non-economic damages.  Disney's unlawful conduct has caused Plaintiff damages, including but not limited to, lost wages, future loss of income, job search expenses; and emotional distress from the violation of hid civil rights, from humiliating mistreatment and discrimination, and from being singled out among other cast members for his religious beliefs.

163. Disney's misconduct was so willful and wanton and in such reckless disregard of the statutory rights of Plaintiff so as to entitle him to an award of punitive damages against Disney, to deter it, and others, from such conduct in the future.

164. Plaintiff has exhausted his administrative remedies prior to bringing this claim before this Court.  42 U.S.C. § 2000e-5.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, order Disney to reinstate his employment, order Disney to remove disciplinary documentation in Plaintiff's file related to Covid-19 vaccine mandate or compliance with Augmented Protocols, order Disney to cease enforcement

of the unlawful Augmented Protocols against all cast members, and order Disney to pay Plaintiff lost wages, any lost benefits, pay attorneys fees and costs, and pay any other such relief as allowed by law and the Court deems just and proper.

**COUNT IX**
**DECLARATORY JUDGMENT**
**DISNEY VIOLATED EMPLOYEES' FLORIDA CONSTITUTIONAL**
**RIGHT TO PRIVACY ART I, § 23.**
*Against All Defendants*

165. Paragraphs 1-64 are hereby incorporated by reference as if fully restated.

166. As pled in this Complaint, Defendant The Walt Disney Company, by virtue of its total control and ownership over local Florida public entity and governmental agency RCID, is a state agency and subject to limitations and obligations of public entities under the Florida Constitution.

167. All other Defendants, as subsidiaries of The Walt Disney Company and as the entities through which The Walt Disney Company engages in its business in Florida, including within the jurisdiction of the RCID, are collectively, together with The Walt Disney Company, a local Florida public entity and governmental agency, subject to Florida's constitutional restrictions.

168. Disney's vaccinate-or-terminate mandate is unlawful because

- it violates the Plaintiff's constitutional right to privacy and bodily autonomy guaranteed by the Florida Constitution, Article I, Section 23;

- it violates the Plaintiff's constitutional right to due process and equal protection of the law guaranteed by the Florida Constitution Article I, Sections 2 and 9;

- it interferes with Plaintiff's exercise or enjoyment of constitutional and statutory rights using threats, intimidation, or coercion - Fl. Stat. § 760.51;

- it violates Fl. Stat. § 381.00315, which grants sole governmental authority in Florida to issue vaccine mandates to the "State Health Officer;"

- it violates Fl. Stat. §§ 381.0016, 112.0441, which forbid local governments and public employers from imposing vaccine mandates on their employees; and

- it is not narrowly tailored to serve a compelling public health or safety purpose as is required under Fl. Stat. § 252.38(4)(b).

169. There is a *bona fide*, actual, present and practical need for the declaration. Disney's violation of law is capable of repetition, but evading review. Disney continued to impose a Covid-19 vaccine mandate against all recruits and new hires at until August of 2022, when it ostensibly dropped its vaccine mandates. Disney justified its actions at all times relevant to the facts of this Complaint and indicated it had the authority to enforce at any time any manner of Covid-19 mandates: "These protocols are subject to change at any time." **Exhibit F.** While Disney "paused" enforcement of its Covid-19 vaccine mandate in

November 2021, the law which stayed Disney's enforcement is set to expire in 2023, without legislative action.

170. The declaration deals with a present, ascertained or ascertainable state of facts or present controversy as to whether the Disney's vaccinate-or-terminate mandate violates Plaintiff's constitutional liberties and is otherwise unlawful.

171. An immunity, power, privilege or right of Mr. Pajer is dependent on the facts or the law applicable to the facts.

172. Mr. Pajer and Disney have, or reasonably may have, an actual, present, adverse and antagonistic interest in the subject matter, either in law or in fact.

173. The antagonistic and adverse interests are all properly before the Court.

174. The relief sought is not merely the giving of legal advice or the answer to questions propounded from curiosity.

WHEREFORE, Plaintiff seeks a declaratory judgment stating that Disney's Covid-19 vaccinate-or-terminate mandate violates Plaintiff's privacy rights under the Florida constitution and is otherwise unlawful; and an award to Plaintiff for his attorney's fees and costs; and order all such further relief as the Court deems necessary and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff respectfully demand a trial by jury on all issues so triable.

Dated this 14th day of February, 2023.

/S/ Rachel L.T. Rodriguez, Esq.
RACHEL L.T. RODRIGUEZ, ESQ.
Florida Bar Number:110425
VIRES LAW GROUP, PLLC
515 N. Flagler Dr. Ste P300
West Palm Beach, FL 33401
(561) 370-7383
rrodriguez@vireslaw.group


        /S/ Carroll G. Sanders
CARROLL G. SANDERS, ESQ.
Florida Bar Number: 52846
CGS LAW, P.A.
1101 E Cumberland Ave, Ste. 201H-133
Tampa, Florida 33602
(813) 279-8491
Carroll@CGSLAW.org

*Attorneys for Plaintiff*